Henrietta M. BOYCE, George William Boyce, Carolyn Scott Boyce, and Hugh R. Boyce, d/b/a Boyceland Dairy, Plaintiffs,

v.

AUGUSTA–RICHMOND COUNTY, and John Doe No. 1 through John Doe No. 100, Defendants.

No. CV198–217.

United States District Court, S.D. Georgia, Augusta Division.

Aug. 22, 2000.

Peter V. Hasbrouck, Richard P. Decker, F. Edwin Hallman, Jr. (Decker & Hallman, Atlanta, GA), John M. Tatum, Robert A. Mullins (Hunter, MacLean, Erley & Dunn, Savannah, GA), for plaintiff.

James W. Ellison, James B. Wall (Burnside, Wall, Daniel, Ellison & Revel, Augusta, GA), R. Perry Sentell, III (Kilpatrick Stockton, Augusta, GA), for defendant.

## *ORDER*

MOORE, District Judge.

Presently before the Court is Defendant Augusta–Richmond County's Motion for Summary Judgment and/or Motion to Dismiss (Doc. 154), and the Plaintiffs' Motion to Dismiss Certain Claims Without Prejudice (Doc. 191). After careful consideration, and for the reasons stated herein, the Court **GRANTS IN PART** Augusta–Richmond County's summary judgment motion, and **GRANTS** the Plaintiffs' motion to dismiss.

## BACKGROUND

I. *Introduction.*

This case concerns Defendant Augusta–

Richmond County's[1] ("ARC") application of sewage sludge from the municipal wastewater treatment plant onto crop land owned by the Plaintiffs. The Plaintiffs contend that the sludge applications, which began in 1986 and continued through 1994, and also occurred from late 1996 until early 1997, contained excessive levels of various metals, thereby harming their land and cattle and hindering their dairy farm operation. As a result, the Plaintiffs have filed the instant lawsuit asserting numerous federal and state law causes of action.

Plaintiff Boyceland Dairy is a family-owned dairy farm operated in northwest Burke County, Georgia. Established around 1946, Boyceland Dairy has been in business for over fifty years and has grown from a small farm with few cows to a very large operation with numerous cows and acreage. At the time of this lawsuit, Plaintiffs had raised dairy cows on approximately 1,100 acres of land. (Pltf.Brf. in Resp. to MSJ at 1–2). Plaintiff George William Boyce ("Bill") is the general manager of the farm, and takes care of many of the day to day operations. (George William Boyce Depo., Vol. 1, at 11). Plaintiff Hugh R. Boyce ("Hugh"), who is Bill's son, also takes care of many of the day to day operations. (*Id.* at 11–12). Plaintiff Henrietta M. Boyce ("Henrietta") is Bill's mother and has retired from the farming operations. (*Id.* at 12). Finally, Plaintiff Carolyn Scott Boyce ("Carolyn") is Bill's wife, conducts much of the farm's bookkeeping, and runs the "baby calf program." (*Id.*).

Defendant Augusta–Richmond County operates a publicly-owned sewage treatment facility called the "Messerly Waste-

water Treatment Plant." The Plaintiffs also have sued Defendants John Does 1– 100. The Plaintiffs, however, have not identified these John Doe Defendants. Despite the presence of the John Doe Defendants, the crux of the allegations in the Complaint, First Amended Complaint, and the summary judgment reply brief concern Defendant ARC rather than the John Does.

## II. The Agreements.

In 1986, ARC contacted Bill Boyce about his farm's participation in a program called the Land Application Program, in which sewage sludge from the municipal wastewater treatment plant would be applied to farmland. Hugh Avery, who was ARC's Land Application Supervisor and was in charge of the Land Application Program from 1984 until 1996, spoke with Bill about the program. (George William Boyce Depo., Vol. 2, at 34). According to Bill, Avery represented that ARC was interested in adding land in Burke County to the land application program. (*Id.*). Although Bill and the Plaintiffs were generally aware that another dairy farm, R.A. McElmurray & Sons, was involved in the Land Application Program, they had no prior experience with sludge applications to their land and knew little about it. (*Id.* at 32).

Bill toured the wastewater treatment plant with Avery. Avery explained how the plant ran, stated that tests were conducted on the sludge daily in the lab, and maintained that the sludge was an "excellent source of potential plant nutrients, such as phosphorous and nitrogen and the greatest thing since sliced bread." (*Id.* at

**1.** The Plaintiffs alleges that Augusta–Richmond County is the successor by consolidation to the City of Augusta, Georgia. (First Amd.Cmplt. at ¶ 1) (Although the First Amended Complaint does not contain a paragraph denominated as paragraph one, the First Amended Complaint re-alleges and incorporates all of the paragraphs of the original Complaint into it). While many of the events in this lawsuit allegedly occurred when Defendant Augusta–Richmond County formerly was designated as the City of Augusta, Georgia, unless otherwise stated, the Court's references to ARC include the former City of Augusta, Georgia.

36). Bill testified in his deposition that Avery indicated that the sludge was safe and there would be no harmful effects. (*Id.* at 37). Based upon the representations, Bill believed the Land Application Program to be "risk free." (*Id.* at 47–48).

After their meetings, Bill Boyce signed an agreement entitled "License/Easement for Land Spreading Digested Sewage Sludge." This agreement, which is dated September 3, 1986, permitted ARC to apply sludge to various parcels of the Plaintiffs' land. (Def. MSJ Exh. 73). Although Bill Boyce, as the land owner/grantor, signed the agreement, he was the only party who signed it. Nevertheless, despite the lack of formal signatures on the agreement, the Plaintiffs admit in their response to the Defendant's statement of material facts that they "granted Defendant consent and permission to apply sewage sludge which Defendant represented to be safe and beneficial" (Pltf.Resp. to Def. Stmt. of Mtl. Facts at ¶ 6). Moreover, the Plaintiffs implicitly recognize the existence of the license/easement agreement because they claim that the "Defendant failed to comply with the express terms of the license/easement agreement for the duration of Plaintiffs' participation in the program." (*Id.* at ¶ 5). Indeed, the Plaintiffs contend throughout their briefs that ARC did not properly comply with certain obligations found in the agreement.

Based on the agreement, ARC was granted a temporary license and easement for "the land spreading of digested sewage sludge" upon the specified parcels of land described in the agreement.[2] (Def. MSJ Exh. 73 at p. 1). The license/easement agreement imposed obligations on both parties. Among other things, the agreements required the Plaintiffs to "obtain and conform to an approved Conservation

Plan developed in cooperation with Briar Creek Soil and Water Conservation District for all lands to receive digested sludge and to maintain all erosion control provisions of the plan . . ." (*Id.* at p. 2, ¶ 3). It also required the Plaintiffs to have annual soil tests conducted by "the Georgia Cooperative Extension Service for the areas involved in land spreading operation" which would report pH levels and levels of Nickel, Zinc, Cadmium, Copper, Lead, and Chromium. (*Id.* at p. 2, ¶ 5) The license/easement agreement further required the Plaintiffs to farm the land in the land spreading operation in accordance with the plans approved by the County Extension Director, and to indemnify and hold harmless the "City Council of Augusta, the Briar Creek Soil and Water Conservation District and the Georgia Cooperative Extension." (*Id.* at p. 2, ¶¶ 6, 8).

Under the agreement's terms, ARC also maintained various obligations. ARC agreed to apply sewage sludge on a "when-available basis" and to provide the grantor of the easement/license "with a chemical analysis of the digested sewage sludge monthly, which shall indicate the following: pH, Nitrogen [ ], Phosphorous [ ], Potash [ ], Zinc [ ], Copper [ ], Nickel [ ], Cadmium [ ] and Lead [ ], Chromium [ ], Ammonia [ ], Nitrate Nitrogen [ ], Total Phosphorous [ ], Total Potassium [ ], and & Solids." (*Id.* at p. 3, ¶¶ 1–2). Moreover, ARC agreed to maintain a file of "all lands involved in the land spreading program with a log of quantity and analysis of material applied to each land" and to

> assign digested sludge to a given land unit based on nutrient requirements for crop production and . . . monitor heavy metals to prevent harmful buildup as set forth in United States Environmental Protection Agency guidelines and as ap-

**2.** Despite their "temporary" nature, the license/easement agreements do not contain a specific termination or expiration date. Each agreement, however, does contain a provision which permits either party to terminate the agreement upon ninety days notice to the other party.

proved by the Briar Creek Soil and Water Conservation District and the County Extension Director.

(*Id.* at p. 3, ¶¶ 3–4).

The Plaintiffs contend that ARC withheld copies of the agreement from them. (Pltf.Brf. in Resp. to MSJ at 4). As a result, they aver that they never were aware of their obligations under the license/easement agreement. (*Id.*). Nevertheless, Bill's signature appears on the agreement. (*See* Defs. MSJ Exh. 73). Bill explained his understanding of the agreement and the circumstances under which he signed it. He testified in his deposition that Avery presented him with the agreement to sign when he was busy at the farm in the yard. (George William Boyce Depo., Vol. 2, at 37–38). Bill asked Avery what it was, and Avery explained to him that it was "just a standard easement" which was used by ARC to relieve it of liability in the event that their trucks damaged the Plaintiffs' property while applying sludge. (*Id.*). When Bill received it, he contends that he glanced at it and then signed it. (*Id.* at 38). Bill further testified that he did not go inside to read it in detail, and that he never received a copy for reference. (*Id.*). Although the Plaintiffs maintain they were unaware of their obligations despite the presence of a signature, they do claim that ARC did not comply with its obligations under the agreements.

### III. *The Sludge Applications and ARC's Monitoring Efforts.*

Beginning in 1986, ARC began to apply sewage sludge to certain parcels of land owned by the Plaintiffs. Based on figures cited in one of the Plaintiffs' numerous expert reports, over 22 million gallons of sludge were applied to 465 acres of Plaintiffs' land over the course of time in which the Boyceland Dairy participated in the program. (Pltf.Expt.Rpt. of Michael R. Wild at 1). The same expert, Michael Wild, also opines that 625 acres of land were actually impacted by the sludge applications, although those 625 acres did not all receive applications.[3] (*Id.*). While the Boyces participated in the program, not all the land received sludge treatments.

The Plaintiffs allege that from the beginning of the sludge applications in 1986, ARC failed to comply with its obligation to provide accurate information to the Plaintiffs concerning (1) the volume of sludge applied to their land; (2) the location of the sludge applications; and (3) the contents of the sludge. (Pltf.Brf. In Opp. to MSJ at 6–7). They also contend that ARC applied sewage sludge which was "hazardous material," and contained hazardous levels of various metals. (*Id.* at 7). The Plaintiffs further maintain that ARC failed to comply with various federal laws and regulations when it applied the sludge to their land.

Despite the Plaintiffs' assertions, ARC contends that it properly analyzed the sewage sludge on a monthly basis. Avery has extensive knowledge of the treatments to Plaintiffs' land because he was in charge of the Land Application Program from 1984 until 1996. He testified that on one day out of each month, a sample of the sludge was obtained from each truck that was loaded with sludge to be applied to land. (Hugh Avery, Jr., Depo. at 81; *see also* Allen Saxon Depo., Vol II at 501–502; Robert Crockett Depo. at 60–61; Tom Wi-

---

3. Michael Wild opines that of "approximately 708 delineated acres of land owned by Boyceland Dairy, 462 acres (or 65% of the total) has had sludge applied to it. Land with animal waste, which could be indirectly impacted by the sludge, totals 163 acres. This brings the land impacted by sludge to 625 acres (88%)."

(Pltf.Exp.Rpt. of Michael R. Wild at 1). The Court notes that Wild's reference to the number of acres owned by the Boyces—approximately 708 acres—differs from the number of acres Plaintiffs' brief in opposition claims they owned—approximately 1,100.

edmeier Depo., Vol II at 33). In turn, ARC took all the samples from that particular day, composited them into one sample, and analyzed that sample for various sludge constituents, including metals. (Avery Depo. at 81; Saxon Depo., Vol II at 502).

ARC used a six-month "moving average" to calculate the loadings of metals onto the farmers' land. (Def.Brf. in Sppt. of MSJ at 8). ARC claims that it used this averaged data so that it could develop a more consistent reading of the sludge content because the sludge was being analyzed only once a month. ARC admits that the averaged data sometimes resulted in lower analysis results, but it also avers that the averaged numbers raised analysis results. ARC used this averaged data, in part, to develop spread sheets it produced to the Plaintiffs incident to this litigation documenting the amount of sludge and metals applied to the Plaintiffs' land. Despite the use of averaged data, ARC claims that it did not use such data when certain federal regulations concerning sewage sludge metals came into effect.

In addition to analyzing the sludge, ARC claims it maintained records of sludge applications to farmlands, records which attempted to track various metals on land, and records which contained computations of nutrient requirements of certain land that received sludge. In fact, Avery testified that to the best of his knowledge ARC kept records of every single sludge application to the Boyceland Dairy. (Hugh Avery, Jr., Depo. at 116). Similarly, ARC contends that it sent these various reports to farmers in the Land Application Program including the Plaintiffs.

Avery testified in his deposition that during the time he was the Land Application Supervisor he provided certain information to farmers participating in the Land Application Program. His deposition reads:

Q: Now, during the time that you were the land application supervisor, what information did you provide to the farmers with regard to the sludge, as far as how much was put on there, the composition of it, or what information did you provide the farmers?

A: The amount of—at the time there were five heavy metals we had to keep a track of. And I felt like that the farmers should be aware of the micronutrients and what was being put on their land. So Allen Saxon and I got together and formulated a form, a sheet, and we would send that out to the farmers.

Q: And what information would be on there?

A: The micronutrients and the five heavy metals.

Q: How often was that sent out?

A: Generally two or three times a year, best I can recall.

. . .

Q: Now, tell us a little bit about the records. Did you try to, or attempt to keep up with the annual and lifetime cumulative loading levels of each of these five metals?

A: Oh, yeah.

Q: How was that done?

A: First it was all done by hand, on the records. And then when the computer program took over, it was supposed to do all that.

Q: Did you monitor that?

A: Yes, sir.

Q: Were you aware of the limits, the annual limits and lifetime limits for each of these five metals?

A: Yes, sir.

Q: And would you monitor each field to try to insure that those limits weren't exceeded?

A: Yes. I did that just to look after the City's well-being.

Q: I understand.

A: And to comply with the law.

(Hugh Avery, Jr., Depo. at 39–42).

ARC has submitted several exhibits which it claims represents examples of the types of reports that it would submit to farmers participating in the Land Application Program. Defendant's Exhibit 2 is a letter from Hugh Avery dated August 17, 1988 and sent to Bob McElmurray, one of the owners of a neighboring dairy that also received sludge applications. It reads in part: "Attached is a statement of the amount of nutrients and heavy metals recently applied to your land in the form of wastewater sludge. The date listed is the date that the application was completed." Appended to the letter is a document entitled "Sludge Application Report" and dated August 19, 1988. The report contains a list of eight sludge components—Nitrogen, Phosphorus, Potassium, Lead, Zinc, Copper, Nickel, and Cadmium—and the amount (in pounds) applied per acre of a specific field. For three of these components, the report also indicates the crop requirement. In addition, the report specifies the total amount of sludge applied, the number of acres to which it was applied, and the number of gallons applied per acre. (Def. MSJ Exh. 2).

Similarly, Defendant's Exhibit 3 is a letter from Avery addressed to Andy McElmurray, another owner of the neighboring McElmurray & Sons dairy, dated July 11, 1989. It reads in part: "Below are the results from the last sludge application to your farm." The letter then has the same list of sludge components as the August 19, 1988 Sludge Application Report, a hand written number by each component, and the total number of acres on which the sludge was applied. (Def. MSJ Exh. 3).

Defendant's Exhibits 74 and 75 are identical letters to Defendant's Exhibit 2 but which Avery actually sent to Bill Boyce. Defendant's Exhibit 74 is dated October 28, 1986, and Defendant's Exhibit 75 is dated October 12, 1987. As with the Sludge Application Report attached to Defendant's Exhibit 2, both of these letters also have Sludge Application Reports as enclosures. These Sludge Application Reports similarly provide breakdowns of the various sludge components that were applied per acre. (*See* Def. MSJ Exh. 74 & 75).

Although the parties have not cited to any deposition testimony concerning Defendant's Exhibits 74 and 75, Mr. Avery testified in his deposition that Defendant's Exhibit 2 and 3 gave "the farmers information as to the amount of those five heavy metals that were applied." (Avery Depo. at 95). The five heavy metals to which Avery was referring are Lead, Zinc, Copper, Nickel, and Cadmium. (*Id.*). While Exhibit 3 is not addressed to any of the Boyces, Avery further explained that Exhibit 3 was an example of the information he provided to all of the farmers, and that Exhibit 3 was a form he devised so that he could provide all of the information found in Exhibit 2 on one page.[4] (*Id.* at 92–93). He stated that he did not recall receiving

---

4. When asked how often these forms would be sent, Avery responded that generally these forms would be sent out for each application. His deposition reads in part:

I would—if it was like a bunch of fields we would do, and what I mean by a bunch, you might hit a tract of land of 400 or 500 acres and it would be cut up into different fields, and then I would just wait until we got through with all of it, send them out, or wait until the end of the—sometimes I would be able to wait until the end of the month. And when I got those records you've got in your hand right there [referring in part to Defendant's Exhibits 2 and 3], then I would have a—what I'm trying to say is we might go to one farm this week and get one field, and then come back a week or two later and get another field for one reason or another. So I'd just hold all the information, pile it up in one envelope

any complaints from any of the farmers, including the Boyces, that they were not receiving enough information about the sludge applications. (*Id.* at 95).

Despite Avery's contentions concerning the County's monitoring of the sludge while he was the Land Application Supervisor, he does not know what information ARC provided to the farmers before he became the Land Application Supervisor in 1984. (Avery Depo. at 40). In fact, he even testified that before he took over as the Supervisor, the record keeping of the Land Application Program was "a shambles" and "pretty much a mess." (*Id.* at 20–21). He explained how he found "load sheets"[5] with a name on them but which listed no particular field and contained incomplete information. (*Id.*). He also testified that he found incomplete "application records"[6] before he took over as the Supervisor.

Other problems also existed with the ARC's records. Beginning at some point after Avery became the Land Application Supervisor,[7] a glitch developed with the computer program that ARC used to keep track of the amount of sludge and metals applied to each piece of land. (Def.Brf. in Sppt. of MSJ at 4–5; Avery Depo. at 24). Avery explained that the computer program was designed to keep records of the total amounts of sludge components applied to each field by computing a running year-to-date (YTD) total and a lifetime-to-date (LTD) total. (Avery Depo. at 24, 98, 223–24; Aff. of Allen Saxon Jr., at ¶ 17). These numbers then would indicate wheth-

er the sludge which was applied to the land exceeded various regulatory ceilings for certain sludge constituents. The computer generated these figures based on hand written records of the quantity of sludge applied and lab analysis which Avery programmed into the computer. (Avery Depo. at 109, 223–24, 242). In turn, the computer produced "field update reports" which were sent to farmers participating in the Land Application Program and were intended to keep track of various metals.

Although Avery believes that the information he entered into the computer regarding the lab results and the quantity of sludge applied was correct, the YTD and LTD figures which the computer program generated are questionable. (Def.Brf. in Sppt. of MSJ at 5; Avery Depo. at 242). Allen Saxon, Jr., who was in charge of the sewage sludge program as the Supervisor of Water Pollution Control, and who also was Avery's supervisor, swore in his affidavit that the computer program did not accurately calculate the YTD and LTD figures. (Aff. of Saxon at ¶ 17). Instead of two different numbers, the YTD and LTD numbers were the same. (*Id.*).

Indeed, the Plaintiffs challenge the information and reports provided by ARC and question their validity. They contend (1) that ARC has "never known the amount and exact location of sewage sludge that was actually applied to Plaintiffs' lands;" (2) that ARC did not, at any time prior to 1999, accurately calculate "required year-to-date and cumulative con-

---

and send it to the farmer the first of the month, middle of the month.
(Avery Depo. at 92).

**5.** A "load sheet" is a record of the trips a driver carrying sludge would load up with sludge. It was supposed to document the fields to which the driver would travel. (Avery Depo. at 20).

**6.** The "application records" would contain numbers from labs which would list the

weight per acre of micronutrients and metal applied on a field. (Avery Depo. at 20).

**7.** Before the computer program was used to keep records, records were kept manually. ARC did not use the computer program, however, until after Avery became the Land Application Supervisor. Avery cannot remember what year ARC began using the computer program to keep track of the sludge applications. (Avery Depo. at 24).

stituent loadings of sewage sludge applications during its applications to Plaintiffs' lands from 1986 through 1996;" (3) that ARC's computer program which calculated metal concentrations was flawed, and that computer generated reports were based on inaccurate data so as to distort the history of the sludge applications; (4) that ARC used "averaged" laboratory data about the contents of the sludge rather than exact numbers to reduce the levels of metals reported; and (5) that ARC did not calculate cumulative loadings of sludge until 1999, and that this calculation omitted over 7,800,000 gallons of sludge that was applied to the Plaintiffs' farmland. (Pltf.Brf. In Opp. to MSJ at 8–9).

In addition to the Plaintiffs' allegations concerning ARC's monitoring of the sludge applications and analysis of the sludge, the Plaintiffs claim that the sewage sludge applied to their land is "hazardous waste" as defined by the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6903(5), and contained hazardous levels of metals. In support of this contention, the Plaintiffs cite to two documents allegedly from the State of Georgia Environmental Protection Division ("EPD").

First, they cite to a document entitled "City of Augusta, SMP Review/Inspection, December 8–11, 1998" that is labeled as Plaintiffs' Exhibit 5.[8] The Plaintiffs contend that in this document the EPD determined that sludge from the wastewater treatment plant was hazardous material at the time ARC applied it to the Plaintiffs' land. They also claim that the EPD concluded in this document that ARC's "sludge is highly corrosive (probably due to sulfides) to the point that the sludge cannot be applied up to the fence lines because it will rust barbed wire."

(Pltf.Brf. in Opp. to MSJ at 14, citing to Pltf's Exh. 5). While this document does contain that statement and other indications that the Land Application Program is problematic, the document is not signed and does not contain a name of the person who wrote it. It also is not clear whether the exhibit is the complete document or not. Further, the document does not refer specifically to the sludge that was applied to the Plaintiffs' land during the period in which the Plaintiffs were involved in the Land Application Program, nor does it specifically conclude that the sludge constituted "hazardous waste" under federal law.

In the second document, Plaintiffs' Exhibit 6, the Plaintiffs claim that Laura Liggett of the EPD provided the factual basis for characterizing the sludge as hazardous waste. This document, however, has no heading and no date and instead appears to be merely type-written notes of Laura Liggett. The document refers to several EPD opinions/memos which allegedly conclude that the sludge is highly corrosive, and that the soil toxicity could be due to the application of the sludge. Nonetheless, the document states that no background samples of soil were collected before the commencement of the sludge applications. In addition, Liggett poses a number of questions and raises issues that she believes need to be investigated further. The document certainly does not appear to be an official finding by the EPD which conclusively determines that the sludge was hazardous waste and caused the problems to Plaintiffs' property.

In any event, the Court notes that the Plaintiffs at least claim that the sludge exceeded certain federal regulatory limits for such components as Arsenic, Lead, Copper, Nickel, Selenium, Zinc, Mercury,

**8.** The Court notes that the Plaintiffs have filed at least two sets of exhibits. One set consists of two boxes containing hundreds of exhibits which are merely entitled "Plaintiffs' Exhibits." The second set consists of fifteen exhibits filed in support of their Motion to Dismiss and in support of their Response to Defendant's Motion for Summary Judgment. The dual sets of exhibits has caused considerable confusion for the Court in its attempt to locate documents to which the Plaintiffs have referred.

Cadmium, and Molybdenum. Whether these documents constitute valid findings and determinations, however, remains a different question.

IV. *Damage to Plaintiffs' Land and Herd, and Plaintiffs' Claims.*

By the end of 1997, Plaintiffs' contend that the mortality rate of their dairy herd rose from an average of 3.1% to 20%. (First Amd.Cmplt. at ¶¶ 86 & 91). By the time they filed their Complaint in late 1998, they aver that the mortality rate was approaching 30%. (*Id.* at ¶ 90). They allege that the decline in the health of their herd was not due to the usual health problems associated with dairy cattle, and that the usual treatments for dairy herd illnesses were ineffective. (*Id.* at ¶¶ 46–47). Ultimately, the Plaintiffs argue that their land received sludge applications containing toxic levels of metals. These toxic metals then allegedly poisoned certain plants which were in turn ingested by the cattle. In March 1997, the Plaintiffs terminated their participation in the Land Application Program.

As a result of the damage to their lands and the harm to their cattle, the Plaintiffs have filed a eighteen-count First Amended Complaint against the Defendants Augusta–Richmond County and John Does 1–100 which contains causes of action arising under both federal law and Georgia law. Counts I through IV and Count XVIII are federal claims, while the remaining counts seek recovery under Georgia law. Count I seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that the Defendants violated various statutes, regulations, and administrative orders. Count II is a citizen suit alleging a violation of the Clean Water Act, 33 U.S.C. §§ 1251, *et seq.* Count III is a citizen suit alleging a violation of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, *et seq.* Count IV alleges a violation of 42 U.S.C. § 1983 for a Fifth and Fourteenth Amend-

ment taking of real property without just compensation. Count V alleges fraud and deceit under Georgia law. Count VI alleges strict liability in tort under Georgia law. Count VII alleges negligence under Georgia law. Count VIII alleges products liability under Georgia law. Count IX alleges a taking of real property under Georgia law. Count X alleges nuisance under Georgia law. Count XI alleges trespass to real property under Georgia law. Count XII alleges trespass to chattel under Georgia law. Count XIII alleges conversion under Georgia law. Count XIV alleges violations of the Georgia Open Records Act, O.C.G.A. §§ 50–18–70, *et seq.* Count XV seeks an injunction. Count XVI seeks attorneys' fees, costs, and expenses under Georgia law. Count XVII alleges professional negligence under Georgia law. Finally, Count XVIII alleges a second violation of 42 U.S.C. § 1983 for a Fifth and Fourteenth Amendment taking of personal property without just compensation.

Defendant Augusta–Richmond County has filed the present Motion for Summary Judgment and/or Motion to Dismiss. In addition, the Plaintiffs have filed a Motion to Dismiss Certain Claims Without Prejudice. In that motion, the Plaintiffs seek to dismiss without prejudice three of the five federal counts, namely Counts I through III, and one state claim, Count XIV for violation of the Georgia Open Records Act. Although ARC filed its Motion for Summary Judgment and/or Motion to Dismiss before the Plaintiffs filed their Motion to Dismiss Certain Claims Without Prejudice, the Court will first analyze the Plaintiffs' motion in order to narrow the issues to be adjudicated on summary judgment.

### DISCUSSION

I. *Plaintiffs' Motion to Dismiss Certain Claims Without Prejudice.*

   A. *The Grounds for and the Procedural Posture of Plaintiffs' Motion.*

The Plaintiffs request that the Court permit them to voluntarily dismiss four of

their claims without prejudice. The Plaintiffs seek dismissal of Count I for declaratory judgment, 28 U.S.C. §§ 2201 and 2202; Count II for a citizen's suit pursuant to the Clean Water Act, 33 U.S.C. § 1365; Count III for a citizen's suit pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B); and Count XIV for a violation of the Georgia Open Records Act, O.C.G.A. §§ 50–18–74, *et seq.*

The Plaintiffs seek dismissal of Count I because they allege that this Court (Judge Dudley H. Bowen) previously adjudicated Defendant ARC liable in *Georgia Environmental Organization, Inc. v. City of Augusta,* Civil Action No. 194–151, Southern District of Georgia, for Clean Water Act violations, National Pollutant Discharge Elimination System violations, and failing to comply with the Rules of the Georgia Department of Natural Resources. In addition, the Plaintiffs contend that a declaratory judgment is no longer needed because the EPD determined in an Administrative Order dated December 28, 1998 that ARC violated various environmental statutes, and because the EPA's and EPD's findings prove all of the issues for which the Plaintiffs' claim for declaratory judgment was originally filed.

The Plaintiffs seek dismissal of Count II because the Clean Water Act ("CWA") does not permit citizen suits if "the Administrator or State has commenced and is diligently prosecuting a civil or criminal action ... to require compliance with" an effluent standard or limitation. 33 U.S.C. § 1365(b)(1)(B). They claim that when they filed this action in November of 1998, neither the EPD nor the EPA was "diligently prosecuting" ARC for failing to comply with CWA provisions. However, during the week of December 7–11, 1998, the Plaintiffs allege that the EPD audited ARC's Messerly Wastewater Treatment Plant, and issued an Administrative Order on December 28, 1998 requiring ARC to make mandatory improvements to the wastewater system. They further contend that EPD and EPA officials have found that the sludge was illegally applied and was a hazardous material. In addition, the Plaintiffs allege that the EPA recently initiated an investigation of the wastewater treatment facility and is investigating the Land Application Program.

Similarly, the Plaintiffs seek dismissal of the claim in Count III under the Resource Conservation and Recovery Act ("RCRA") because it does not permit citizen suits when the "Administrator ... has commenced and is diligently prosecuting an action under" RCRA. 42 U.S.C. § 6972(b)(2)(B)(i). Again, the Plaintiffs allege that there is no need to pursue such a claim because the EPA and EPD are actively pursuing an investigation of ARC's sewage sludge program.

Finally, the Plaintiffs seek dismissal of Count XIV for violations of the Georgia Open Records Act, O.C.G.A. §§ 50–18–70, *et seq.* The Plaintiffs request dismissal of this claim because on July 1, 1999 a new code section was enacted, O.C.G.A. § 50–18–74, which changes provisions relating to the time and manner in which custodians must respond to requests for inspection. Thus, the Plaintiffs seek dismissal of the claim under the old statute, and plan to use the new statute to obtain documents which they allege have been concealed or altered under prior Open Records Act requests.

ARC does not object to dismissal of these four counts without prejudice. However, it contends that it is entitled to attorney's fees and costs if the Court dismisses the claims without prejudice.

■ Generally, Fed.R.Civ.P. 41(a) governs the voluntary dismissal of actions. Under Rule 41(a)(2), a plaintiff must obtain leave of court to dismiss an action after an answer or motion for summary

judgment has been filed by a defendant. Where a plaintiff seeks dismissal of a claim in a multi-count complaint, however, and does not seek dismissal of the entire action, the Court must treat the motion as a motion to amend the complaint to delete the particular claims under Rule 15(a).[9] *Anderberg v. Masonite Corp.*, 176 F.R.D. 682, 686 (N.D.Ga.1997); *see also Exxon Corp. v. Maryland Casualty Co.*, 599 F.2d 659, 662 & n. 10 (5th Cir.1979);[10] 9 Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure*, § 2362 (2000 Supp). Because the Plaintiffs do not seek to dismiss the entire action, but only request dismissal of four claims from their complaint, the Court construes the motion as a Rule 15(a) motion to amend.

B. *Rule 15(a) Motion to Amend Complaint.*

Rule 15(a) states in part:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Although Rule 15(a) guides the Court's analysis of the Plaintiffs' motion, similar standards govern the exercise of the Court's discretion under Rule 41(a) and Rule 15(a). *Anderberg*, 176 F.R.D. at 686. Thus, the Court will consider Plaintiffs' motion in light of the policies underpinning both rules.

As Rule 15(a) states, once the adverse party has filed a responsive pleading, a plaintiff may only amend the complaint by leave of court or by written consent of the adverse party. Nonetheless, the policy of Rule 15(a) espouses liberal allowance to amend. *Espey v. Wainwright*, 734 F.2d 748, 750 (11th Cir.1984) ("unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial"). Because of the policy which favors liberal allowance to amend, a "substantial reason" must exist for the Court to deny the motion. *Id.* at 750. Factors that justify denial of a motion to amend include "undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, and futility of the amendment." *Anderberg*, 176 F.R.D. at 686 (citing *Espey*, 734 F.2d at 750). In addition, when considering a similar Rule 41(a) motion, the Court should examine whether the plaintiff's request will cause a defendant to suffer "clear legal prejudice, other than the mere prospect of a subsequent lawsuit, as a result." *McCants v. Ford Motor Company, Inc.*, 781 F.2d 855, 856 (11th Cir.1986); *Anderberg*, 176 F.R.D. at 687. Legal prejudice is present where a party's actual legal rights are threatened or "where monetary or other burdens appear to be extreme or unreasonable." *Green Giant Co. v. M/V Fortune Star*, 92 F.R.D. 746, 748 (S.D.Ga.1981).

---

**9.** The language of Rule 41 refers to dismissal of an "action" and not a dismissal of a "claim." *Anderberg*, 176 F.R.D. at 686 n. 2; *Smith, Kline & French Laboratories v. A.H. Robins Co.*, 61 F.R.D. 24, 29 (E.D.Pa.1973). The Federal Rules and case law, however, distinguish between "actions" and "claims." *Anderberg*, 176 F.R.D. at 686 n. 2 (citing *Smith, Kline & French Laboratories*, 61 F.R.D. at 29). Thus, Rule 41 which governs the dismissal of an "action" does not govern the dismissal of separate "claims" which constitute an "action." *Id.*

**10.** The Eleventh Circuit has adopted the case law of the former Fifth Circuit handed down prior to October 1, 1981 as included in its governing body of precedent. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Here, although ARC does not object to dismissal without prejudice, it indicates that the Plaintiffs have waited a very long time to bring the motion and that fifteen months have elapsed since the filing of the complaint. Although ARC does not agree with the Plaintiffs' characterization of the alleged findings, it contends that the Plaintiffs knew about the alleged court and agency determinations, and investigations by the EPA and EPD, many months before filing the present motion. ARC also contends that the Plaintiffs never responded to its argument concerning these four counts in its summary judgment motion. Thus, ARC insinuates that the Plaintiffs are using the motion to dismiss without prejudice as a tactic to enable them to refile these four claims at a later date and to remedy any weakness in those claims which the summary Judgment motion revealed. Finally, ARC claims that the Plaintiffs filed their motion after ARC already had spent over $1 million conducting discovery.

■ Despite ARC's concerns, the Court concludes that it is appropriate for the Plaintiffs to amend their complaint to delete four of the claims. Most importantly, ARC consents to dismissal without prejudice. ARC states in writing that it "does not oppose the plaintiffs' motion to dismiss but submits to the Court that fundamental fairness and the law indicates that the dismissal without prejudice of these claims should be accompanied by an appropriate award of costs and attorney's fees." (Def.Resp.Pltf.Mot. to Dis. at 13). The Court recognizes that ARC was speaking in terms of a voluntary motion to dismiss rather than a motion to amend. Nonetheless, because the Court is interpreting the motion for voluntary dismissal as a motion to amend, the Court construes the Defendant's statement as consent to the Court permitting an amendment of the complaint deleting the four claims. ARC merely requests that the Court grant it fees and costs if the Court dismisses the claims.

In addition to ARC's consent, the Court determines that the Rule 15(a) and Rule 41(a) factors further support deletion of these four claims. While the Court questions the Plaintiffs' delay in bringing the motion, ARC has not demonstrated how it has been prejudiced by this time lapse. The Court is mindful that extensive and expensive discovery has been conducted by ARC and that the discovery period has expired. But ARC has not shown how it has expended time and resources concerning these four claims that it would not otherwise have had to expend to defend the numerous other claims in this case. Many of the remaining claims still require similar investigations into soil and sludge content and extensive analysis of the Plaintiffs' land.

In addition, ARC will not be prejudiced by the deletion of these four claims, because it will no longer have to defend them. Because of the investigations by the state and federal governments, the first three federal claims have now been rendered unnecessary. Moreover, even if the Plaintiffs filed a separate lawsuit in the future alleging these claims, ARC presumably would have the material it needs in order to defend such claims. *See Anderberg,* 176 F.R.D. at 687 ("if the evidence accumulated during discovery may be used in a subsequent lawsuit, then the fact that costs were incurred in conducting discovery will not in itself constitute plain prejudice"). Likewise, even if the claims are never again asserted in any forum, prejudice may be avoided by this Court taxing the discovery costs to the Plaintiffs.

Along these same lines, the Court does not find that ARC will be prejudiced because there is a pending summary judgment motion which concerns several of these claims. *Berry v. General Star National Insurance Co.,* 190 F.R.D. 697, 699 (M.D.Ala.2000) (no prejudice to defendant in granting Rule 41(a)(2) motion for voluntary dismissal even though case is ripe for

disposition on summary judgment); *Spencer v. Moore Business Forms, Inc.*, 87 F.R.D. 118, 119 (N.D.Ga.1980) ("a mere missed opportunity for a legal ruling is not sufficient to warrant the denial of a motion for voluntary dismissal"). In addition, ARC has not shown that its legal rights will be jeopardized by the deletion of these claims from the complaint. The Court has not entered a substantive ruling concerning any of these claims and has not yet addressed them on the merits.

In *Spencer*, the district court determined that a defendant would be prejudiced by a voluntary dismissal without prejudice of certain claims after the court already had granted the defendant partial summary judgment on several of those claims. *Spencer*, 87 F.R.D. at 121. Because the court had not conducted a trial on the remaining claims and no final judgment had been entered in the case, the defendant's substantive legal rights would be jeopardized because allowing the plaintiff to dismiss without prejudice would deprive the defendant of a previous adjudication on the merits. *Id.* Consequently, it dismissed with prejudice those claims in which a substantive ruling had already been entered. *Id.* at 124. On the other hand, however, the court dismissed without prejudice those claims in which it had not already entered a ruling on the merits. The court reasoned that even though the case had been pending for four years, extremely large sums of money had been expended, and extensive discovery had taken place, the defendant would not be prejudiced by a second suit on those claims in which the court had not adjudicated the merits. *Id.* 124. The present case is consistent with the court's ruling in *Spencer* that for those claims the court had not already addressed, dismissal without prejudice was appropriate despite the inordinate amount of time and expense already expended by the defendant in the case.

Because courts should freely grant leave to amend, ARC consents to dismissal without prejudice, and ARC will not suffer prejudice by allowing the deletion of the claims, the Court **GRANTS** the Plaintiffs' motion. Counts I, II, III, and XIV are hereby deleted from the complaint and first amended complaint.

ARC has requested attorney's fees and costs concerning these deleted claims. The Court may award costs and fees as a condition of granting leave to amend to alleviate any prejudice to the defendant caused by the deletion of the claims. *Anderberg*, 176 F.R.D. at 687; *General Signal v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1514 (9th Cir.1995), *cert. denied*, 516 U.S. 1146, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996); *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 599 (5th Cir.1981); *Local 783, Allied Industrial Workers of America v. General Electric Co.*, 471 F.2d 751, 756 (6th Cir.), *cert. denied*, 414 U.S. 822, 94 S.Ct. 120, 38 L.Ed.2d 55 (1973). *Cf. McCants v. Ford Motor Company, Inc.*, 781 F.2d 855, 860 (11th Cir.1986) ("plaintiff ordinarily will not be permitted to dismiss an action without prejudice under Rule 41(a)(2) after the defendant has been put to considerable expense in preparing for trial, except on condition that the plaintiff reimburse the defendant for at least a portion of his expenses of litigation"). In the present case, it is appropriate for the Court to allow the Plaintiffs to amend the complaint on the condition that they compensate ARC for certain discovery fees and expenses related *solely* to the deleted claims.

At this point, however, the Court cannot make an award because ARC has not shown what expenses and costs were incurred *solely* for the defense of Counts I, II, III, and XIV and which will not further the defense of any of the remaining claims. The Court is quite skeptical that ARC can connect any expenses solely to the now-deleted claims. Nonetheless, the Court will permit ARC to recover *reasonable* fees and expenses for discovery which

ARC can show are solely related to the deleted claims. ARC is **DIRECTED** to provide the Court with a brief which specifically outlines the discovery expenses and fees related *solely* to Counts I, II, III, and XIV. If ARC cannot demonstrate and substantiate that a certain discovery expense cannot be used for any of the other remaining claims, the Court will not permit recovery for that expense. If ARC is not sure whether or not a discovery expense is related solely to one of the deleted counts, it should not include that expense or try to pass it by the Court. The Court will not tolerate any trickery or deception. The same can be said of the Plaintiffs' reply. If the Plaintiffs know that a certain discovery expense cannot further any of the remaining claims, the Plaintiffs should not oppose that expense just for the sake of being argumentative.

While the Court understands the complex nature of the allegations, the Court also recognizes that the parties to this case have been litigious, perhaps to an overly excessive degree.[11] The Court has grown weary of each side's caustic attacks on the other as well as the sheer morass of paper that both sides have produced. The Court will not permit this contentiousness to continue as it considers ARC's brief. Defendant ARC's brief will be due within twenty days of the date of this Order, and the Plaintiffs will have an opportunity to reply to the brief within fifteen days of its filing. The Court will not permit any response briefs. Each brief will be limited to fifteen pages, not including any exhibits.

## II. *ARC's Motion for Summary Judgment.*

### A. *Motion for Summary Judgment Standard.*

Summary Judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56 advisory committee's note). The Court's analysis ends "where there is no genuine issue of material fact and where the moving party is entitled to judgment as a matter of law." *Great Lakes Dredge & Dock Co. v. Miller*, 957 F.2d 1575, 1578 (11th Cir.1992); *Real Estate Fin. v. Resolution Trust Corp.*, 950 F.2d 1540, 1543 (11th Cir.1992) (both citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Tidmore Oil Co. v. BP Oil Co./Gulf Prods. Div., a Div. of BP Oil Co.*, 932 F.2d 1384. 1387–88 (11th Cir.1991), *cert. denied*, 502 U.S. 925, 112 S.Ct. 339, 116 L.Ed.2d 279 (1991). The substantive law governing the action determines whether an element is essential. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1505 (11th Cir.1989), *cert. denied*, 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to

---

11. At present, there have been nearly 350 docket entries in this case since its inception.

interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. *Thompson v. Metropolitan Multi–List, Inc.,* 934 F.2d 1566, 1583 n. 16 (11th Cir. 1991), *cert. denied,* 506 U.S. 903, 113 S.Ct. 295, 121 L.Ed.2d 219 (1992); *Chanel, Inc. v. Italian Activewear of Fla., Inc.,* 931 F.2d 1472, 1477 (11th Cir.1991). A dispute of material fact "is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. If the nonmoving party's response to the summary judgment motion consists of nothing more than mere conclusory allegations, then the court must enter summary judgment in the moving party's favor. *Peppers v. Coates,* 887 F.2d 1493, 1498 (11th Cir.1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, [then] there is no genuine issue for trial." *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *See Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505; *Johns,* 927 F.2d at 556.

In assessing whether the movant is entitled to summary judgment in its favor, the district court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.* 951 F.2d 1235, 1237 (11th Cir.1992); *Ryder Int'l. Corp. v. First Am. Nat'l. Bank,* 943 F.2d 1521, 1523 (11th Cir.1991). The Court must avoid weighing conflicting evidence, *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505; *McKenzie v. Davenport–Harris Funeral Home,* 834 F.2d 930, 934 (11th Cir.1987). A mere "scintilla" of evidence supporting the opposing party's po-

sition, however, will not suffice. *E.g., Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton,* 883 F.2d 923, 933–34 (11th Cir.1989) (citation omitted).

**B.** *Counts IV and XVIII: Section 1983 Taking Without Just Compensation.*

**1.** *Plaintiffs' Allegations.*

With the deletion of Counts I, II, and III, the only remaining federal claims are the Plaintiffs' allegations in Counts IV and XVIII that Defendant ARC effected an unconstitutional taking. Count IV seeks recovery under 42 U.S.C. § 1983 because Defendant ARC allegedly took Plaintiffs' lands without just compensation. Similarly, Count XVIII alleges a claim under § 1983 because Defendant ARC purportedly took Plaintiffs' personal property without just compensation. Both counts contend that the allegedly contaminated sludge has diminished the value of the Plaintiffs' land (Count IV) and personal property (Count XVIII), and has made both commercially unmarketable. As a result, the Plaintiffs maintain that Defendant ARC illegally took their real and personal property without just compensation, thereby violating their rights under the Fifth and Fourteenth Amendments.

**2.** *Takings Claims.*

At the outset, the Court must determine the specific type of constitutional claim that the Plaintiffs are making. A plaintiff presenting a takings issue has four types of constitutional claims available. *Eide v. Sarasota County,* 908 F.2d 716, 720 (11th Cir.1990), *cert. denied,* 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991). The Eleventh Circuit refers to these variations

"as just compensation, due process takings, arbitrary and capricious due process, and equal protection claims." *Id.* First, a plaintiff can claim that his or her property was taken without just compensation in violation of the Fifth Amendment. *Id.* at 720. Second, a plaintiff can claim that a regulation goes so far that it destroys the value of his or her property such that it is a taking by eminent domain. Such a claim constitutes a due process takings claim.[12] *Id.* at 721. Third, a plaintiff can claim that a regulation which affects private property is arbitrary and capricious and bears no substantial relation to the public good, and is therefore an invalid exercise of the police power. *Id.* This third type of takings claim is identified by the Eleventh Circuit as "an arbitrary and capricious due process claim." *Id.* at 722. Many other courts also refer to this third type of claim as a substantive due process claim. *Id.* at 722, n. 9. Finally, a plaintiff may claim an equal protection violation and attack a regulation on its face or as applied to the property. *Id.* at 722.

Although the Plaintiffs allege, among other things, that their Fourteenth Amendment rights have been violated, and mindful that this amendment contains a due process provision, the Court concludes that the Plaintiffs have asserted a Fifth Amendment just compensation claim. In *Bensch v. Metropolitan Dade County*, 952 F.Supp. 790, 795 (S.D.Fla.1996), the Plaintiffs alleged a "taking [ ] without just compensation in violation of the Fifth and Fourteenth Amendments of the United States Constitution." There, the court determined that "[t]his is clearly the first type of claim as identified by the Eleventh Circuit, i.e., a Fifth Amendment takings claim." Here, the wording of Counts IV and XVIII is similar to that in *Bensch.* In

addition to *Bensch*, the Court's determination is bolstered by the fact that the Plaintiffs do not specifically refer to violations of the due process clause or the equal protection clause. The Plaintiffs' reference to the Fourteenth Amendment is explained by the fact that the Fifth Amendment is made applicable to the states through the Fourteenth Amendment's Due Process Clause. *Rymer v. Douglas County*, 764 F.2d 796, 800 (11th Cir.1985).

In the clear and simple language of our forefathers, the Fifth Amendment concludes by stating: "nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. Fifth Amendment takings jurisprudence has evolved since the promulgation of that Amendment so that it now recognizes an expanded variety of compensable takings. Initially, with the advent of the Constitution and during the early years of this nation's history, a taking was a clear event. It simply occurred when the government exercised its power of eminent domain and physically occupied land. *Hendler v. United States*, 952 F.2d 1364, 1371 (Fed.Cir. 1991). For example, if the government needed land to house a military base or build an office, the government could exercise its power of eminent domain, take the land or property, and then provide the owner with just compensation.

Later, as government activity increased, the government at times would indirectly invade an owner's private property without following the appropriate steps to acquire that property. *Id.* An example of this type of taking would be if the government built a road on one person's land and followed the appropriate procedures to compensate that owner for the taking, but the road building activity caused some type of dam-

---

12. The practical difference between a just compensation claim and a due process takings claim is that a successful due process takings claim can result in invalidation of the regulation and possibly actual damages, while a Fifth Amendment just compensation claim is remedied by monetary compensation for the value of the property taken. *Eide,* 908 F.2d at 721.

age, such as flooding, to the adjoining landowner's property. *Id.* This type of taking amounts to inverse condemnation whereby the adjoining landowner, who has suffered a diminution in the value of his land because of the government's construction, could bring suit to obtain compensation from the government. *Id; see e.g.* *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) (holding that frequent overflights that interfere directly and immediately with use and enjoyment of land require compensation); *Pumpelly v. Green Bay & Mississippi Canal Co.,* 13 Wall. 166, 80 U.S. 166, 20 L.Ed. 557 (1871) (finding a physical taking by flooding of land).

The Supreme Court has defined an "inverse condemnation" claim as "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." *United States v. Clarke,* 445 U.S. 253, 257, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373 (1980) (quoting D. Hagman, *Urban Planning and Land Development Control Law* 328 (1971)); *see also Bensch,* 952 F.Supp. at 793. Similarly, an inverse condemnation claim exists where "the government has not directly proceeded to appropriate title or possession of property but has destroyed its actual usefulness and value by reason of the de facto exercise of the power of eminent domain." *Florida East Coast Properties, Inc. v. Metropolitan Dade County,* 572 F.2d 1108, 1111 (5th Cir.1978), *cert. denied,* 439 U.S. 894, 99 S.Ct. 253, 58 L.Ed.2d 240 (1978). The Fifth Amendment's takings clause establishes the basis for inverse condemnation claims, and prevents the government from claiming private property without providing remuneration to the property owner. *Hendler v. United States,* 952 F.2d 1364, 1371 (Fed.Cir.1991); *Bensch,* 952 F.Supp. at 793.

Whether through the government's appropriation of property pursuant to a formal exercise of its eminent domain power, or through inverse condemnation and the reduction in the value of non-appropriated property, both types of takings share a common denominator. In each, the government physically invades or occupies private property, or it causes a physical invasion or occupation of private property. *Hendler,* 952 F.2d at 1371. Hence, these more traditional notions of takings are considered physical takings. Generally, for physical takings, the rule is simple and liability is a forgone conclusion. Under the takings clause, "a permanent physical occupation authorized by government is a taking without regard to the public interest that it may serve." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). "[N]o matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation." *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992).

As the government has taken an increasingly regulatory role in society, however, the notion of a governmental taking has expanded beyond the physical occupation of property. Primarily through zoning laws, governmental entities can impact the value and uses of land without actual physical occupation. Regulatory takings occur when government acts go "too far" such that they deprive owners of significant value and compensation is required. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). Unlike physical takings, however, caselaw focusing on the question of which regulatory acts constitute compensable regulatory takings is much more convoluted. While it is unnecessary for the Court to delve into an in-depth examination of the minutiae of regulatory taking caselaw, the Supreme Court has articulated that no

established formula exists which determines whether compensation is required for a governmental restriction on property. *See Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). Nevertheless, the Supreme Court has directed courts to consider three factors: "the character of the governmental action," the "economic impact of the regulation on the claimant," and the "extent to which the regulation has interfered with distinct investment-backed expectations." *Id.*

In the case at bar, the alleged takings that the Plaintiffs claim more properly fall under the rubric of a physical taking rather than a regulatory taking. Certainly, the Plaintiffs do not allege that some type of ordinance or statute or other type of government regulation has reduced the value of their property. Instead, they contend that the sludge which ARC physically applied to their land resulted in a taking. Although ARC has not directly appropriated title or possession of the property, the Plaintiffs allege a taking occurred by ARC applying tainted sludge and thereby diminishing the property's value. In effect, it appears that they are alleging an inverse condemnation claim whereby governmental activity, ARC's dumping of the sludge, allegedly resulted in a diminution of the value of their property. Nonetheless, the Court's determination that the Plaintiffs are alleging a physical taking does not mean that a physical taking actually occurred and the Plaintiffs are automatically entitled to recover. Issues surround whether the Plaintiffs' claim is ripe for review, whether the Plaintiffs' claim really amounts to a claim for breach of contract and is not proper under § 1983, and whether the Plaintiffs consented to the sludge applications.

### 3. *Ripeness.*

■ Prior to analyzing the underlying merits of the Plaintiffs' § 1983 takings claims, the Court must first determine whether the claims are ripe for review. Federal courts are courts of limited jurisdiction; they may only hear cases that they have been authorized to hear by the Constitution or Congress. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). As a federal court of limited jurisdiction, the Court must inquire into the existence of subject matter jurisdiction *sua sponte*, even if the parties have not challenged it. *Rembert v. Apfel*, 213 F.3d 1331, 1334 (11th Cir.2000). Ripeness, or the question of whether a matter is ready for review, is an issue of subject matter jurisdiction. *Reahard v. Lee County*, 978 F.2d 1212, 1213 (11th Cir.1992). Consequently, the Court must first determine whether it has the jurisdictional power to review the § 1983 takings claims.

■ It is well established that a Fifth Amendment takings claim is not ripe for review until the property owner first has exhausted state procedures for obtaining just compensation. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 721, 119 S.Ct. 1624, 1644, 143 L.Ed.2d 882 (1999); *Williamson County Regional Planning Comm'n. v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194–96, 105 S.Ct. 3108, 3120–21, 87 L.Ed.2d 126 (1985); *Anthony v. Franklin County*, 799 F.2d 681, 683 (11th Cir.1986); *Saffold v. Carter*, 739 F.Supp. 1541, 1544 n. 3 (S.D.Ga.1990). In articulating this rule in *Williamson County Regional Planning Comm'n*, the Supreme Court reasoned that the Fifth Amendment does not prohibit takings; rather it only proscribes uncompensated takings. 473 U.S. at 194, 105 S.Ct. at 3120. "If a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Id.* at 195, 105 S.Ct. at 3121. *See also Anthony,*

799 F.2d at 684 (holding that Fifth Amendment takings claim premature until owner utilizes state procedures); *Fountain v. Metro. Atlanta Rapid Transit Authority,* 678 F.2d 1038, 1046 (11th Cir.1982) ("a suit involving state condemnation of private property is primarily a local matter that is best left to the state courts"); *Provident Mutual Life Insurance Co. of Philadelphia v. City of Atlanta,* 864 F.Supp. 1274, 1280 (N.D.Ga.1994) (holding that Fifth Amendment takings claim premature until owner utilizes state procedures).

■ Georgia law provides a procedure for a property owner to obtain compensation for the inverse condemnation of property. GA. CONST. art. I, § 3, ¶ 1.; *Provident Mutual Life Insurance Co. of Philadelphia,* 864 F.Supp. at 1280 (N.D.Ga.1994). In the present case, however, there is no evidence, or even an allegation, that the Plaintiffs filed an inverse condemnation claim in state court. Because the Plaintiffs have not availed themselves of the available state procedure to seek recompense for the allegedly taken property, Plaintiffs' Fifth Amendment claims in Counts IV and XVIII are not ripe for adjudication. Consequently, the Court lacks jurisdictional authority to hear these claims, and must dismiss them.

#### 4. *The Agreements and § 1983 Takings Claims.*

Even if the Court maintained subject matter jurisdiction over the takings claims, the validity of the takings claims is questionable. Among other things, the Plaintiffs' contend that ARC did not comply with the various obligations set forth in the license/easement agreements. More particularly, the Plaintiffs aver that ARC did not properly analyze the sludge and land to prevent a harmful buildup of various metals and other components. In addition, they contend that ARC did not regularly keep accurate records of the sludge applications and analytical findings. In effect, the Plaintiffs' claim that ARC breached the various contracts between the two parties and that the Plaintiffs' land and cattle was damaged as a result.

■ ARC argues in its motion that "the facts in this case do not rise to the level of a constitutional taking or violation." (Def.Brf. in Sppt. of MSJ at 42). It is well established that a breach of contract claim does not give rise to a § 1983 constitutional claim. *Medical Laundry Services, A Division of OPLCO, Inc. v. Board of Trustees of the University of Alabama,* 906 F.2d 571, 573 (11th Cir.1990). *See also Key West Harbour Development Corp. v. City of Key West, Florida,* 987 F.2d 723, 728 (11th Cir.1993) ("[t]he existence of an enforceable contract with a state or local government entity does not give rise to a constitutionally protected property interest"); *Braden v. Texas A & M University System,* 636 F.2d 90, 93 (5th Cir. Unit A Feb.1981) ("If the State merely breached a contract with [plaintiff] he would have no cause of action under Section 1983"). While the Plaintiffs never alleged a breach of contract claim against Defendant ARC or the John Doe Defendants in either their Complaint or First Amended Complaint, it appears to the Court that the Plaintiffs' § 1983 takings claims are in substance claims for breach of contract. In fact, when discussing the takings claims, the Plaintiffs' state in their response brief that "[o]nce the parties contracted for sludge applications, Defendant was required, *by contract law* and by federal and state law, to monitor all sludge applications to Plaintiffs' properties and provide data ..." (Pltf.Brf. in Resp. to MSJ at 38) (emphasis added).

■ Even if the agreements do not constitute valid contracts, however, the fact that the Plaintiffs and ARC entered into agreements indicates that the Plaintiffs

consented to certain sludge applications. Along these lines and outside the context of breach of contract, another line of case-law indicates that a property owner cannot bring an inverse condemnation claim when the owner permits the government to use the property pursuant to an agreement. In *Janowsky v. United States*, 23 Cl.Ct. 706, 713 (1991), *reversed in part and vacated in part on other grounds*, 989 F.2d 1203, 1993 WL 36863 (Fed.Cir.1993), the United States Court of Federal Claims stated that

> a taking of private property for public use is different in kind from the government's receipt of property pursuant to an agreement with the property owner. Under this analytical distinction, when a citizen delivers property to the government pursuant to an agreement, an inverse condemnation claim does not arise simply because the government does not pay; the property owner's consent to the arrangement vitiates a claim that the government took the property for public use within the meaning of the Fifth Amendment.

As a result, *Janowsky* recognized a "bright line" between voluntary dealings involving property owners and the government and constitutional takings of property. *Id.* at 714. *See also Sun Oil v. United States*, 215 Ct.Cl. 716, 572 F.2d 786, 818 (1978) (stating that "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily ... created by contract.... In such instances, interference with such contractual rights generally gives rise to a

breach claim not a taking claim."); *Marathon Oil Co. v. United States*, 16 Cl.Ct. 332, 338 (1989) (stating that "the clear thrust of the authorities [regarding taking claims] is that where the government possesses property under the color of legal right, as by an express contract, there is seldom a taking in violation of the fifth amendment."); *National Board of the YMCA v. United States*, 184 Ct.Cl. 427, 396 F.2d 467, 475 (1968) (finding no Fifth Amendment taking partly because "the structural changes [of the property] ... were made with the consent of the owner"), *aff'd*, 395 U.S. 85, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969) [13]; *J.J. Henry Co. v. United States*, 188 Ct.Cl. 39, 411 F.2d 1246, 1249 (1969) (stating that "where the government possesses property under color of legal right, as by an express contract, there is seldom a taking in violation of the Fifth Amendment. The amendment has limited application to the relative rights in property of parties litigant which have been voluntarily created by contract.").

Here, the basis for Plaintiffs' takings claim really centers on the Plaintiffs' allegations that ARC breached various terms of the license/easement agreements. Certainly, the Plaintiffs permitted ARC to apply sludge to certain parcels of land. While the Court recognizes that the Plaintiffs contend that the Defendant applied sludge to certain parcels of land that were not identified in any of the agreements, the Plaintiffs also claim that agreements governed other parcels of land to which sludge was applied.[14] Further, the Plaintiffs make no attempt to clearly distinguish the parcels which were governed by an agree-

---

**13.** In *National Board of YMCA,* the plaintiffs sought recovery against the United States under the Fifth Amendment for damages caused by rioters in the Panama Canal Zone while the buildings were occupied by United States troops. Although the Federal Court of Claims premised its holding on the rule that destruction of private property in battle or by military forces is not compensable under the Fifth Amendment, in denying recovery the court still recognized the significant role that the owners' consent played in denying them recovery. 396 F.2d at 470.

**14.** The briefs do not provide a clear breakdown of which specific parcels of land were covered by the agreements and the dates in which they were covered, and those which were not covered by the agreements.

ment and the parcels which were not covered by an agreement. Moreover, for the agreements which were entered, the Plaintiffs do not aver that they did not voluntarily enter into these agreements or were forced to enter them. With respect to any of the parcels of land which were covered by the agreements, the takings claims are improper. Plaintiffs' rights concerning these parcels of land emanate from the agreements, not the Fifth Amendment's Just Compensation Clause.

### C. *State Law Claims.*

■ With the deletion of three federal claims (Counts I, II, and III), and the Court's determination that the Plaintiffs' Fifth Amendment claims (Counts IV and XVIII) are improper, the only claims that remain are the Plaintiffs' twelve state law claims.[15] The Court, however, chooses to not exercise its supplemental jurisdiction to hear these remaining claims. Pursuant to 28 U.S.C. § 1367(c), the District Court may decline to exercise supplemental jurisdiction over claims in § 1367(a) if:

(1) the claim raises a novel or complex issue of State law;

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction;

(3) the district court has dismissed all claims over which has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). *See also Rice v. Branigar Organization, Inc.,* 922 F.2d 788, 792 (11th Cir.1991) (holding that the District Court's decision to exercise pendent jurisdiction over state law claims is discretionary, and that the District Court can

only abuse its discretion by dismissing the state claims when no state forum is available).

Here, the Court determines that it is not appropriate to exercise its supplemental jurisdiction for several reasons. First, the Court has dismissed all the claims over which it has original jurisdiction. Second, even if the Court had not dismissed any federal claim, the state law claims predominate in this lawsuit. They are numerous and they involve complicated issues of Georgia law. Additionally, the fact that the Plaintiffs must first exhaust state remedies to attempt to recover for a taking provides further support for the Court's refusal to exercise its supplemental jurisdiction. Because the Court refuses to exercise its supplemental jurisdiction under the authority of § 1367(c), the Court need not consider ARC's arguments in its summary judgment brief concerning the state law claims.

### CONCLUSION

The Court has carefully analyzed the Plaintiffs' Motion to Dismiss Certain Claims Without Prejudice, and the Defendant's Motion for Summary Judgment and/or Motion to Dismiss. The Court interprets Plaintiffs' Motion to Dismiss as a Rule 15(a) Motion to Amend. The Court **GRANTS** that motion. (Doc. 191). Counts I, II, III, and XIV are **DELETED FROM THE FIRST AMENDED COMPLAINT.** Defendant Augusta–Richmond County, however, will be permitted to recover reasonable fees and expenses for discovery which it can demonstrate are related *solely* to the deleted claims. Defendant Augusta–Richmond County is **DIRECTED** to file within twenty days of this Order a brief outlining the discovery fees and expenses it incurred in defending Counts I, II, III, and XIV and which can-

---

**15.** These twelve remaining claims do not include the deleted claim for an alleged viola-

tion of the Georgia Open Records Act.

not be used to defend the non-deleted counts. The Plaintiffs will be permitted to file a reply brief within fifteen days of the filing of ARC's brief. These briefs are limited to fifteen pages apiece, not including exhibits. The Court will not permit response briefs.

In addition, the Court determines that it lacks subject matter jurisdiction to hear the Fifth Amendment takings claims. Consequently, the Court **GRANTS IN PART** the Defendant's Motion for Summary Judgment and/or Motion to Dismiss. (Doc. 154). With the dismissal and deletion of the federal claims, no other federal questions remain in this case. The Court chooses to not exercise its supplemental jurisdiction to hear the Georgia law claims. Finally, the Court **DENIES AS MOOT** the remaining pending motions. The Court **DIRECTS** the Clerk's Office to **CLOSE THE CASE.**